Filed 10/31/23  P. v. Orozco CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. SERGIO OROZCO, Defendant and Appellant. | D081156 (Super. Ct. No. SCN387908) |

APPEAL from a judgment of the Superior Court of San Diego County, Kelly C. Mok, Judge.  Affirmed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew S. Mestman, and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Sergio Orozco of voluntary manslaughter (Pen. Code,[1] § 192). It also found true that Orozco personally used a deadly weapon (a knife) (§ 12022, subd. (b)(1)).[2]

After the jury was dismissed, the trial court granted the prosecution's request to amend the information by adding aggravating sentencing factors. During the sentencing hearing, the trial court used one or two of those factors to sentence Orozco to prison for 11 years.

Orozco appeals, contending the trial court erred in failing to instruct the jury on (1) involuntary manslaughter as a lesser included offense of murder and (2) voluntary intoxication causing unconsciousness. Additionally, Orozco maintains the trial court erred by allowing the prosecutor to add aggravating factors to the information after the jury was discharged and then by denying Orozco a jury trial as to those factors. Finally, Orozco asserts the court abused its discretion in sentencing him to the upper term.

We conclude that Orozco's arguments lack merit. As such, we affirm the judgment.

FACTUAL BACKGROUND

*Prosecution*

In 2015, Orozco, his girlfriend Adriana C., and Adriana's brother Victor C., lived together in an apartment in Lancaster, California. On one occasion, Adriana overheard Orozco angry during a telephone conversation with his mother. Adriana subsequently went outside to call Orozco's mother to apologize for Orozco's behavior. While Adriana was on the telephone with

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     The jury acquitted Orozco of murder (§ 187, subd. (a)).

2

Orozco's mother, Orozco was outside pacing back and forth and angrily yelling. Orozco had a cut on his lip, a small bump or bruise by his eye, and he was bleeding. When Adriana went back inside, Victor told her that he hit Orozco in self-defense after Orozco came into his bedroom. Adriana told Orozco to leave and that she was breaking up with him. Orozco moved out for a few weeks, but then moved back in after the couple reconciled. Orozco told Adriana he was sorry, and it would not happen again. Orozco wanted to apologize to Victor, but Victor was not willing to accept the apology. Victor moved out of the apartment.

In early 2018, the three decided to live together again. Thus, in June 2018, all three lived at an apartment complex in Vista where Adriana was the onsite manager. They resided in the manager's apartment.

On June 23, 2018, Victor went to a friend's house in Oceanside. Another friend, who arrived later, estimated that he saw Victor drink four to five beers over the next two to three hours. When it came time to leave, Victor wanted to go to a bar or a marijuana dispensary, but his friend drove him back to the Vista apartment and dropped him off at about 10:00 or 11:00 p.m.

Earlier that evening, Orozco dropped off Adriana at the home of a friend of hers to attend a birthday party.

Sometime after midnight, surveillance video showed Orozco and Victor at a convenience store buying beer.

At around 3:00 a.m., a woman at the Vista apartment complex awoke to the sound of a man repeatedly yelling, "[L]et me in," followed by, "I'm going to fucking kill you." The woman looked out the window and saw the man banging on the screen door and then the window. The man was stumbling, pacing back and forth, and slurring his words. He appeared to be in his

twenties, was 5'7" or 5'8" tall, had a skinny to medium build, maybe weighed 150 pounds, had a "buzz" haircut, and was wearing long white socks, long baggy black shorts, and no shirt. At one point, the man said, "Fuck you, ese." The woman then saw the apartment door open and heard another man say, "calm down." She continued to hear arguing and possibly an altercation due to muffled sounds and grunting.

Another neighbor walked past the manager's apartment at around 3:00 a.m. and noticed that the lights were still on. He did not hear any noise inside. As he was getting ready for bed, he heard Orozco yelling for help several times.[3] The neighbor stepped out on his balcony and saw Orozco "bust[] open" the door and yell for help and ask for someone to call the police. Orozco said he was sorry, and yelled, "there is blood" while holding out and looking at his arms. He sounded scared and drunk. The neighbor did not call the police because he was unsure whether Orozco actually needed help or was just intoxicated. Orozco looked up at the neighbor and said, "[F]uck you then."

A third neighbor and her family returned home at around 3:00 a.m. and saw a shirtless man with a shirt slung over his shoulder who was wearing long white socks and walking around. The neighbor and her family were sitting in their car talking for about 20 minutes when they saw a car resembling the apartment manager's pull out of a parking spot, pause for a bit with the driver seeming to be staring at the neighbor, and then speed off. Shortly thereafter, the neighbor saw the manager's apartment door wide open and saw a person lying in the kitchen bleeding. The neighbor called the police.

_____

[3]    The witness did not identify the person yelling for help as Orozco. However, the parties agree that it was him.

At about 3:50 a.m., Gilbert A. saw a car stopped at a green light and observed what looked to be a man (Orozco) throwing up outside the driver's door. Gilbert called 911. The car suddenly sped off, driving erratically, and Gilbert followed. The car hit a fence and the airbags deployed. Orozco exited from the back passenger door, said, "it was all going to be alright," and aggressively tried to shake Gilbert's hand. Gilbert did not want Orozco to touch him, and told him to back up, sit down, and the police were on the way. Orozco said, "[F]uck you, ese," and told Gilbert to stop following him or "I'm going to blast you." Orozco grabbed a hoodie from the car and walked away.

At around 4:00 a.m., as Orozco was walking, Adriana called, hoping Orozco could pick her up from the party. Orozco sounded upset and paranoid and told Adriana that the cartel got her brother. He asked Adriana to meet him on a street near the apartment. She stayed on the telephone with Orozco while she was driving to meet him, and the last thing she heard before the call disconnected was the police telling Orozco to put his hands up.

When the police responded to the apartment, they found Victor, who was shirtless and wearing sagging pants with visible athletic shorts, dead. He suffered five stab wounds, including a 3.75-inch-deep wound to his throat, 4-inch and 6-inch-deep wounds to his back and chest, and the most severe being a 4-inch-deep wound to his neck that severed his left jugular vein. There also were blunt force injuries to his back, arm, and inside his lower lip. He had no injuries to his right knuckles. Orozco had injuries to his right-hand knuckles.

Both men's blood tested positive for alcohol. Extrapolating back to the estimated time of Victor's death, a toxicologist opined Orozco likely had a blood alcohol level between .187 and .257. Victor's blood alcohol levels were

5

measured at .24. His toxicology report was also consistent with having very recently used cocaine and less recently having used marijuana.

In a recorded jail call, when asked by his cousin what happened, Orozco said, "I fucked up, (unintelligible) look at my charges," and "fucked up shit happened (unintelligible)."

*Defense*

Orozco testified in his own defense. He met Victor in 2014 when he moved in with Adriana. Apparently, Victor was a private person who kept to himself; so, it took a while for Orozco to get to know him. Orozco did not dislike Victor.

Orozco testified that when Victor moved back in with him and Adriana in 2018 in Vista, they all got along. In fact, Orozco and Victor would walk the dog together, go out to eat, and play video games. Because Victor was Adriana's brother, Orozco wanted the best for him and felt love toward him.

On June 23, 2018, after Orozco dropped off Adriana at her friend's house, he stopped by a convenience store and bought a six-pack of "strong" beer. When he got home, he set up a video gaming computer and played video games. By the time Victor's friend dropped Victor off back at the apartment, Orozco had consumed four beers and gave Victor the other two. The two of them then separately played video games before going to a convenience store to buy another six-pack of strong beer. The surveillance video at the store showed Orozco smiling and patting Victor on the back.

After returning to the apartment, they drank beer and talked. Hours later, Victor asked for the car keys to go somewhere, but Orozco refused to give him the keys or a ride because they were both drunk. Victor became upset and walked out of the apartment. Orozco locked the door out of habit. He then went to his room and played video games while listening to music.

6

However, Orozco became "fed up" and laid down. He eventually went to the kitchen for another beer.

While in the kitchen, Orozco heard a loud pounding sound. He could not remember whether he locked the door, and he grabbed a nearby kitchen knife and ran toward the door. Orozco explained that he did not know who would be "knocking on the door like that. So out of instinct . . . [he] just grabbed the knife and ran to the door . . . for precaution." When he got to the door, he heard Victor shouting, "Open the fucking door. I'm going to kill you." Orozco told him to calm down and that he was opening the door. Orozco stated that he had never heard Victor "this mad before." He intended to "try to calm him down and try to open the door." Orozco still had the knife at this point, but he admitted that he was not thinking about whether Victor was armed. Nonetheless, he acknowledged that he would not have opened the door if he thought Victor had a weapon.

Orozco testified that when he opened the door, Victor "storm[ed] in" and "rush[ed]" him, causing him to fall backwards. Orozco described Victor's movement as "a dive, like him kind of just throwing himself right at me." After Victor realized Orozco had a knife, he started grabbing for it.[4] As Orozco explained, "[T]hat's when it all just changed. It became really, really, fast, like, it just all happened. Like, blood started being all over us and stuff. And I was just really like really freaked out, you know. We both were."

During his direct examination, Orozco and his attorney engaged in the following discussion regarding whether Orozco remembered stabbing Victor with the knife:

---

[4]    Orozco testified that he did not tell Victor that he had a knife. Nor did he show him the knife. Also, he later testified that he did not know if Victor "even really paid attention that there was a knife in my hands."

"Q  Do you remember using the knife on Victor?

"A  Yeah, I mean, after that he kept going for the knife and kept and kept.  And then I had a grip on it and then he tried to get it from me and we were just struggling right there.  And then he was on top of me over by the kitchen.  And then I—the knife must of like made all the blood, you know.

"Q  Do you remember hitting him with the knife at the door?

"A  I'm not sure exactly, like, right at the door.  But, I mean, when he came in, he lunged at me, I don't know exactly how it went.  It must of cut him because there was blood.  I mean, that's when there started being blood and then when went to the floor it became more blood."

Subsequently, defense counsel asked Orozco if he remembered striking Victor with the knife when they were on the floor.  Orozco responded, "I mean, like, not like briefly aware and stuff like that but I mean I did feel it after."

Orozco testified that as they struggled on the ground, they rolled over each other twice and ended up by the kitchen.  They were both "fighting for the knife."  Orozco stated that they "rolled one more time," Victor was on top of him, they "were just going for the knife, and then the knife was used, and then that's when all the blood happened."  Orozco saw large amounts of blood as they both kept struggling for the knife.[5]

Victor remained on top of Orozco and then he stopped moving.

---

[5]  During cross-examination, the prosecutor asked Orozco at what point he stabbed Victor in the face.  Orozco responded, "At the point where he was on top of me over there by the kitchen we rolled over and I just had swung the knife."

8

Orozco stated that he was worried that Victor would get the knife and use it on him. He explained that when Victor tried to grab the knife, the altercation "became very serious." He also admitted that the fight "would have been different" "if we wouldn't of had the knife right there."[6]

Orozco said he never intended to kill Victor.[7] After Victor stopped moving, Orozco still had the knife in his hand. He stood up, threw the knife on the floor, put on a sweater, and ran outside screaming for help. He did not see the neighbor in the nearby apartment.

Orozco remembered leaving in the car and driving really fast, intending to go to his mother's house, but he did not remember stopping at the green light or vomiting at the light. He remembered crashing into a curb and fence but did not recall his interaction with Gilbert.

Orozco said he lied to Adriana because he did not know what else to tell her and could not tell her what happened. He continued to speak with Adriana for over a year and a half after Victor's death. During that time, he continued to deny killing Victor. He told his cousin in a phone call the day after his arrest that he "fucked up" because of everything that happened. He left Victor dead and bleeding on the floor and felt they should not have been drinking that night.

---

[6] At one point, when Orozco no longer had possession of the knife, he repeatedly punched Victor in the face and regained possession of the knife. At another point in the altercation, Victor almost got ahold of the knife, but, Orozco assumed Victor cut his hand while grabbing the blade (although Orozco did not see it happen).

[7] After being shown photographs of the stab wounds, Orozco stated that he was the only person in the room with Victor; thus, he must have caused whatever injuries occurred.

DISCUSSION

I

JURY INSTRUCTIONS

A.  Orozco's Contentions

Orozco argues the court committed reversible error by failing to instruct the jury on (1) involuntary manslaughter as a lesser included offense of murder and (2) voluntary intoxication causing unconsciousness.  We disagree with both of these arguments.

B.  Background

During the conference on jury instructions, the trial court indicated that it was planning to instruct the jury on first degree murder, second degree murder, and voluntary manslaughter.  It asked counsel whether they agreed to those instructions.  Orozco's counsel argued to exclude an instruction on first degree murder, contending there was no evidence presented at trial to support such a charge.  The prosecutor responded that she was taking the position that it was Orozco who the neighbors heard outside the apartment, banging on the door, demanding to be let in, and threatening to kill the apartment's occupant.  Based on the prosecution's theory of the case, the court disagreed with defense counsel and indicated that it would instruct the jury as to first degree murder as well as second degree murder and voluntary manslaughter.

Relating to voluntary manslaughter, Orozco's counsel maintained, and the trial court agreed, that the jury should be instructed under CALCRIM No. 570 (Voluntary Manslaughter: Heat of Passion) and CALCRIM No. 571 (Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another).  Defense counsel did not request an involuntary manslaughter instruction.

10

Later during the hearing on jury instructions, the trial court stated that it intended to provide CALCRIM No. 625 (Voluntary Intoxication: Effects on Homicide Crimes) but not CALCRIM No. 626 (Voluntary Intoxication Causing Unconsciousness: Effects on Homicide Crimes). Defense counsel stated that he did not believe CALCRIM No. 626 "applie[d] to this specific incident but I could be wrong." After reviewing the instruction, counsel then stated, "I think that it only applies to involuntary manslaughter, so submitted." The court then stated that it would not instruct the jury under CALCRIM No. 626, "stipulated by each side."

Thus, among other instructions, the court provided the jury with instructions on murder (CALCRIM Nos. 520, 521, 522), heat of passion voluntary manslaughter (CALCRIM No. 570), and imperfect self-defense voluntary manslaughter (CALCRIM No. 571). The court also gave various self-defense instructions (CALCRIM Nos. 505, 3471, 3472, 3472). No involuntary manslaughter instruction was given.

During closing argument, the prosecutor maintained that it was Orozco who was on the other side of the apartment door before the altercation; therefore, he was the individual who said, "Let me in, I'm going to kill you." Based on this theory of the case, the prosecutor told the jury that first degree murder was the appropriate verdict.

In contrast, defense counsel told the jury "[t]his is a self-defense case" and "the only real question . . . is, is it manslaughter or self-defense." To this end, counsel admitted that when Victor entered the apartment, Orozco was holding the knife. And when "Victor c[ame] at him more near the center of his chest . . . that knife str[uck] him in the head." Further, defense counsel asserted that Orozco's testimony supported the theory that Orozco "reasonably believed that the immediate use of deadly force was necessary to

11

defend against that danger," the "danger of being killed or suffering significant bodily injury." Additionally, counsel emphasized that the prosecutor had to prove that Victor's death was not the result of a sudden quarrel or committed in the heat of passion, otherwise "a murder is reduced to voluntary manslaughter." Indeed, defense counsel seemed to concede that Orozco had used deadly force, and the jury needed to determine whether the use of that force was reasonable. In short, Orozco's counsel insisted this was not a murder case. Rather, the evidence presented a choice between voluntary manslaughter or a not guilty verdict.

C. Involuntary Manslaughter Jury Instruction

Although Orozco's trial counsel did not ask for a jury instruction on involuntary manslaughter, Orozco argues that the trial court committed reversible error by failing to give such an instruction sua sponte. Specifically, Orozco contends there was substantial evidence presented at trial raising "doubt whether . . . Orozco possessed the requisite degree of malice." To this end, Orozco emphasizes that he testified that he did not intend to kill Victor. And he did not remember intentionally stabbing Victor with the knife.

The People contend there was insufficient evidence to trigger the sua sponte instruction. They insist, "at the very least, the evidence showed [Orozco] acted with conscious disregard for life when he stabbed Victor five times with a six-inch blade knife causing deep wounds to Victor's throat, neck, back, and chest, including severing this jugular vein." The People have the better argument.

When there is substantial evidence showing a defendant committed a lesser included offense, the trial court has a duty to instruct the jury on it. (*People v. Cook* (2006) 39 Cal.4th 566, 596 (*Cook*).) "The court must, on its own initiative, instruct the jury on lesser included offenses when there is

12

substantial evidence raising a question as to whether all the elements of a charged offense are present [citations], and when there is substantial evidence that the defendant committed the lesser included offense, which, if accepted by the trier of fact, would exculpate the defendant from guilt of the greater offense." (*Ibid*.) We review de novo the trial court's failure to instruct on a lesser included offense, considering the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder. [Citations.]" (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) "[M]alice may be express or implied. [¶] . . . [It] is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a).) It is "implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Knoller*, at p. 143.) Implied malice has " 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another

13

and . . . acts with a conscious disregard for life." ' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

Voluntary manslaughter and involuntary manslaughter are both lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) "The lesser included offense of manslaughter does not include the element of malice, which distinguishes it from the greater offense of murder. [Citation.]" (*Cook*, *supra*, 39 Cal.4th at p. 596.)

"When a homicide, committed with malice, is accomplished in the heat of passion or under the good faith but unreasonable belief that deadly force is required to defend oneself from imminent harm, the malice element is 'negated' or . . . 'mitigated'; and the resulting crime is voluntary manslaughter, a lesser included offense of murder. [Citations.]" (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*).)

In contrast to murder and voluntary manslaughter, involuntary manslaughter is an unlawful killing of a human being without malice or mitigated malice. (§ 192, subd. (b).) "One commits involuntary manslaughter either by committing 'an unlawful act, not amounting to [a] felony' or by committing 'a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).)" (*Cook*, *supra*, 39 Cal.4th at p. 596.)

Involuntary manslaughter also may be based on an unlawful killing in the course of an inherently dangerous assaultive felony without malice (i.e., without the intent to kill or without conscious disregard for life). (*Brothers*, *supra*, 236 Cal.App.4th at pp. 33–34; see *People v. Bryant* (2013) 56 Cal.4th 959, 970 ["voluntary manslaughter requires either an intent to kill or a conscious disregard for life"].)

" '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' " that the lesser offense, but not the greater, was committed.' " (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

We find no error in the trial court's decision not to instruct the jury on involuntary manslaughter. Even viewing the evidence in the light most favorable to Orozco, there was insufficient evidence for the instruction because a reasonable juror could not have entertained a reasonable doubt that defendant acted in conscious disregard of the risk his conduct posed to Victor's life. (See *Brothers*, *supra*, 236 Cal.App.4th at p. 34 [no substantial evidence of absence of malice warranting an involuntary manslaughter instruction, because even crediting defendant's testimony that she did not intend to kill the victim, there was not "evidence from which a reasonable juror could entertain a reasonable doubt that [defendant] had acted in conscious disregard of the risk her conduct posed to [the victim's] life"].)

The evidence presented by Orozco at trial showed that he engaged in inherently dangerous assaultive felony conduct (*Brothers*, *supra*, 236 Cal.App.4th at pp. 34–35), namely, he armed himself with a knife and stabbed Victor five times, including in his throat, neck, and back. Although the evidence presented was less than clear regarding what Orozco could remember about the stabbing, it was undisputed that Victor never possessed the knife, and Orozco admitted to using the knife and swinging it. Further, the jury found true the allegation that Orozco personally used a knife.

15

And though Orozco contends a reasonable jury could have concluded that his conduct lacked malice, he points to nothing in the trial record indicating he lacked a subjective awareness of the danger his conduct posed to human life. In fact, Orozco tacitly acknowledged that his altercation with Victor would have been different had Orozco not wielded a knife. In other words, Orozco admitted that the knife greatly escalated the danger to both he and Victor during their altercation. Moreover, this is not a case where defense counsel argued that Orozco accidentally stabbed Victor. To the contrary, counsel argued that Orozco used deadly force, and it was up to the jury to decide whether Orozco's response to Victor was reasonable (resulting in a not guilty verdict) or unreasonable (pointing to a voluntary manslaughter verdict). Accordingly, the trial court did not err. (*Brothers*, *supra*, 236 Cal.App.4th at p. 35 ["when . . . the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter"].)[8]

---

[8] In his reply brief, for the first time, Orozco argues "the evidence alternatively supports a finding that Mr. Orozco brandished the knife upon seeing [Victor][,] a misdemeanor, which then led to [Victor's] death, even if those stab wounds occurred unintentionally." When an appellant fails to raise an issue in the opening brief, raising it for the first time in a reply brief or at oral argument, we generally decline to address the issue or address it in a summary manner. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) Thus, we find this issue forfeited. Further, even if we addressed this claim on the merits, it would fail. Brandishing a weapon may be committed by drawing or exhibiting a weapon in a rude, angry, or threatening manner. (§ 417, subd. (a)(1); e.g., *People v. Sanders* (1995) 11 Cal.4th 475, 542.) There

D. CALCRIM No. 626

Unconsciousness caused by voluntary intoxication is not a complete defense to a criminal charge, but it may reduce some homicides to involuntary manslaughter. (*People v. Ochoa* (1998) 19 Cal.4th 353, 423; CALCRIM No. 626.) Here, Orozco argues that the trial court erred by failing to instruct, sua sponte, under CALCRIM No. 626.

CALCRIM No. 626 provides, in relevant part: "Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions. [¶] . . . [¶] When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter. . . ."

A trial court must instruct regarding involuntary manslaughter based upon unconsciousness whenever there is sufficient evidence that the defendant was unconscious due to involuntary intoxication. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 418 (*Halvorsen*); *People v. Turk* (2008) 164 Cal.App.4th 1361, 1371–1372 (*Turk*).) "Due process requires that the jury be instructed on a lesser included offense *only* when the evidence warrants such an instruction." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.)

---

is no evidence in the record that Orozco brandished the knife. Indeed, he testified that he did not show Victor the knife before he opened the door, and he did not claim that Victor saw the knife before Victor dove at him. Alternatively stated, there is no evidence in the record supporting Orozco's contention that he brandished the knife.

17

In the instant matter, the evidence was insufficient to support instruction with CALCRIM No. 626. No expert or other witness testified that Orozco was so " 'grossly intoxicated' " as to be unconscious when he committed the killing. (*Turk*, *supra*, 164 Cal.App.4th at p. 1379.) Evidence that Orozco was intoxicated before the killing (he had drunk multiple "strong beers" and had a blood alcohol level of two to three times the legal limit) and that he could not remember stabbing Victor was insufficient, by itself, to warrant an unconsciousness instruction. (See *Halvorsen*, *supra*, 42 Cal.4th at p. 418 [expert testimony that the defendant's blood-alcohol content might have approached 0.20 at the time of the shootings and that defendant "habitually drank to excess with resultant memory losses" did not constitute substantial evidence warranting an involuntary manslaughter instruction premised on unconsciousness]; *People v. Rogers* (2006) 39 Cal.4th 826, 888 (*Rogers*) ["Defendant's professed inability to recall the event, without more, was insufficient to warrant an unconsciousness instruction"].)

Moreover, Orozco remembered several events on the evening of the stabbing. He testified that he drove to a convenience store with Victor and bought a six pack of beer (he even recalled the specific type of beer). Orozco said he was okay to drive because, while he was "more than buzzed," he was not "drunk." Hours later, after he and Victor had been drinking beer, Orozco made the conscious decision to refuse to give Victor the car keys or a ride because they had been drinking. Orozco testified that when Victor returned to the apartment after having previously left, he (Orozco) grabbed a knife when her heard a loud pounding at the door. He testified that Victor was yelling and threatening him, and in return, he told Victor to calm down. He explained how the two of them then began a struggle and described the struggle. After Orozco stabbed Victor to death, he retrieved a sweater, put it

18

on, ran outside, and asked for help. When a nearby neighbor apparently did not call for help, Orozco looked up at the neighbor and said, "[F]uck you then." Orozco then walked down the stairs to the apartment parking garage, pulled Adriana's vehicle out of the parking spot, waited for the garage gate to open, and then drove out of the complex. He drove off quickly, putting the car into sport mode so he could drive faster, intending to go to his mother's house to seek help. He remembered crashing into a curb and fence. When exiting the car thereafter, he took his cell phone and charger from the car. When Adrianna called him shortly thereafter, Orozco told her the cartel killed Victor, and he asked her to meet him near the apartment. Despite recalling these many events, he maintains that he cannot recall intentionally stabbing Victor with the knife, and thus, CALCRIM No. 626 was warranted. Yet, simply forgetting the actual crime in light of everything else he did remember is not sufficient to warrant an instruction regarding unconscious due to involuntary intoxication. (See *Rogers*, *supra*, 39 Cal.4th at p. 888.)

In addition, at trial, Orozco's theory of the case was that he stabbed Victor in self-defense or as the result of a sudden quarrel. His attorney did not argue that Orozco was too intoxicated to intentionally kill Victor or that he was unconscious when he did so. Put differently, this was a self-defense case (either reasonable or imperfect). It was not a case where the evidence suggested or the defense counsel argued that Orozco was unconscious by way of voluntary intoxication when he killed Victor.

Against this backdrop, the evidence does not permit a reasonable inference that Orozco's voluntary intoxication rendered him unconscious, i.e., where he physically acted but was not conscious of acting. (See *Halvorsen*, *supra*, 42 Cal.4th at p. 417; *People v. Carlson* (2011) 200 Cal.App.4th 695, 704.)

19

## II

## SENTENCING ISSUES

### A. Orozco's Contentions

Orozco argues the trial court violated his right to due process and trial by jury by allowing the prosecutor to amend the information to add aggravating factors after the jury was discharged. We are not persuaded by this argument because, even if we assume that Orozco was entitled to a jury trial as to certain aggravating factors, other aggravating factors listed in the amended information were properly before the trial court. As such, any error was harmless.

Orozco also contends the court abused its discretion by not properly considering mitigating factors. We disagree.

### B. Background

On August 10, 2022, the jury convicted Orozco of voluntary manslaughter and found true that he personally used a deadly weapon. That same day, the jury was discharged.

On September 29, 2022, the prosecution filed a "Motion on Factors in Aggravation Pursuant to Penal Code Section 1170 and Statement in Aggravation," attaching certified records of Orozco's prior convictions. In the motion, the prosecution sought leave to amend the information to allege and prove various aggravating factors, under the California Rules of Court,[9] to

---

[9]    Future references to rule or rules are to the California Rules of Court.

support an upper term sentence.[10] The prosecution noted that the trial court may consider the records of Orozco's prior convictions in aggravation without submitting those to the jury.

The defense filed an opposition to the prosecution's motion. In its opposition, the defense argued that the only aggravating factor the court could consider without a jury determination was his prior convictions evidenced by certified records. The defense argued the court was not permitted to make factual findings regarding any other factors, such as "increasing seriousness," unsatisfactory performance on probation, or the use of a weapon.

At the sentencing hearing on October 21, 2022, the trial court found that Orozco had suffered a juvenile true finding for a second-degree felony on January 22, 2009 and, on June 24, 2009, was found in violation of the terms of his juvenile probation. The court found Orozco suffered two further misdemeanor true findings as a juvenile, also both in 2009. The court also determined that, in April 2010, Orozco was convicted of a non-strike felony and that, in April 2012, probation was revoked and reinstated. Both parties stipulated that Orozco's adult conviction was later reduced to a misdemeanor and expunged.

The trial court thus found Orozco had sustained prior criminal acts within the meaning of rule 4.408(a). Over defense counsel's argument that the expungement was evidence Orozco had successfully completed his

---

10    The aggravated factors included the allegations that: (1) Orozco's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings were numerous or of increasing seriousness (rule 4.421(b)(2)); (2) Orozco suffered prior convictions (rule 4.408; *People v. Berry* (1981) 117 Cal.App.3d 184, 191); (3) Orozco's performance on probation or parole was unsatisfactory (rule 4.421(b)(5); and (4) Orozco was armed with or used a weapon at the time of the commission of the crime (rule 4.421(a)(2)).

21

probation, the trial court found true the allegation that Orozco's past performance on probation was unsatisfactory. (See rule 4.421(b)(5).)

The trial court then, initially, found the record did not show Orozco's priors were of increasing seriousness. After the prosecutor highlighted the "or" language in the relevant rule (rule 4.421(b)(2)), the trial court found true the allegation that Orozco's priors were numerous.

Lastly, the trial court concluded the jury had found true the allegation Orozco had personally used a deadly weapon, so as to qualify for an additional aggravating factor under rule 4.421(a)(2). Orozco's counsel objected to the weapons finding being considered as an aggravating factor because it was not pled and proven as such.

Regarding mitigating factors, defense counsel argued that the provided child welfare records evidencing the significant trauma Orozco suffered as a child, the number of years that had passed since Orozco's past conviction, and the fact that he was a contributing member of society all justified the low term or, at a minimum, weighed against imposition of the upper term. In response, the prosecution urged that, even if there was an issue with the aggravating factors not having been proven true by a jury, the aggravating factors weighed against imposition of the low term.

After detailing the trauma Orozco had suffered as a child, the trial court held it could not "see the connection" to the abuse suffered at seven or eight years old at the hands of his family members. To the extent childhood trauma was a contributing factor, the trial court found the low term still was not appropriate because the "sheer violence of the incident outweigh[ed] the mitigating factor of the childhood trauma."

In consideration of the prior record and the finding that Orozco "was not successful on probation," the trial court found that the upper term was

warranted. The trial court noted the jury's finding on the weapons allegation and then additionally cited to the "numerous stab wounds," and "great violence" as aggravating factors. Following repeated objections by defense counsel, the trial court stated: "[t]he only aggravating factor that this Court is using is the record of the prior conviction, as well as the personal use of a deadly weapon."

Defense counsel then requested the court reconsider, noting that the court needed to balance the aggravating factors against the additional mitigating factors. Apart from the childhood trauma, Orozco's counsel emphasized the unusual circumstances of the offense, as corroborated by the jury's acquittals on the greater offense, the intoxication of both parties at the time of the offense, and the relatively minor nature of Orozco's criminal record.

The trial court explained it was not finding there were unusual circumstances and also was not finding Orozco's intoxication to be a mitigating factor. The trial court then struck punishment under section 12022, subdivision (b)(1), because it was using the weapons factor as justification for imposing the upper term of 11 years.

Orozco's counsel then stated that he wanted to make sure "the record [wa]s super clear for appellate purposes"; thus, he asked the court if its finding that the upper term was appropriate was based on rules 4.421(b)(2), 4.421(b)(5), 4.408(a), and 4.421(a)(2). The court responded:

> "Correct. I did take into account each one of those prior conviction findings, including the fact that he sustained prior juvenile true findings and criminal conviction under [rule] 4.408(a), as well as . . . . his performance on probation on the felony case, which was later reduced and expunged,

23

that he did have a revocation. And so I do find that, that was unsatisfactory.

"I didn't get any information that he did perform probation satisfactory. Other than I understand your argument, [defense counsel], that circumstantially because it was reduced and expunged, your argument that it was a satisfactory completion of probation, I don't find that it was satisfactory completion of probation.

"And then under [rule] 4.4421(b)(2) that his prior true findings and convictions were numerous and those are the prior convictions, aggravating factors that this Court did consider. And then the Court also considered the personal use of a weapon that was found true by a—"

Defense counsel interjected that it was objecting to the court considering the various aggravating factors because "any aggravating factor beyond the record certified prior conviction . . . cannot be considered unless it is found true by the jury. It's a very clear code section. [¶] And I'm making—the Court has made clear it decided to make its own factual findings that were not proven by the jury, and the defense objects to that based on notice and the requirements of the law."

The court then noted that Orozco had the opportunity to present evidence and argument to the court regarding the aggravating factors. Defense counsel insisted Orozco was entitled to a jury trial on most of the aggravating factors, which he was denied. The court countered that it found "that the aggravating factors of the prior conviction is in itself sufficient to justify the upper term in this case."

C. Analysis

Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) amended section 1170, subdivision (b) by restricting a trial court's discretion to impose an upper-term sentence. (Stats. 2021, ch. 731, § 1.3.) As relevant here,

24

effective January 1, 2022, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2); *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038.)

In addition, the parties agree that Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 695, § 5.1) (Assembly Bill 124), also effective January 1, 2022, amended section 1170 by adding paragraph (6) to subdivision (b), as follows: "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense. [¶] (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking." (§ 1170, subd. (b)(6).)[11] Section 1016.7, subdivision (b), defines a " 'youth' " as "any person under 26 years of age on the date the offense was committed." (§ 1016.7, subd. (b).)

---

[11] Technically, Senate Bill 567 added subdivision (b)(6) to section 1170. (See *People v. Jones* (2022) 79 Cal.App.5th 37, 44, fn. 11.)

Senate Bill 567 and Assembly Bill 124 were effective at the time Orozco was sentenced. Orozco claims that the trial court violated both provisions during sentencing. Specifically, he argues that he was entitled to a jury trial as to certain aggravating factors on which the trial court relied to select the upper term for his sentence. He also maintains that the court abused its discretion in considering the improper aggravating factors and failing to sufficiently weigh the mitigating factors in sentencing him.

Generally, we review a trial court's sentencing decisions for abuse of discretion, evaluating whether the court exercised its discretion "in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.' " (*People v. Sandoval* (2007) 41 Cal.4th 825, 847 (*Sandoval*).)

As a threshold matter, we note that the amendment of the information in this case was somewhat atypical. Below, the prosecution moved to amend the information to include aggravating factors after the jury returned its verdict and was discharged but before sentencing. Yet, section 1009 allows a court to permit an amendment to an information "at any stage of the proceedings." (§ 1009; see *People v. Valladoli* (1996) 13 Cal.4th 590, 594; *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1362, fn. 7.) And Orozco does not argue here that the court abused its discretion simply by allowing the indictment to be amended. Rather, the issue before us involves what needed to occur after the information was amended, namely whether the aggravating factors had to have been found true beyond a reasonable doubt by a jury.

As discussed *ante*, the trial court allowed the prosecution to amend the information to include the following aggravating factors: (1) Orozco suffered prior convictions and sustained petitions in juvenile delinquency proceedings;

26

(2) Orozco's prior convictions and sustained petitions in juvenile delinquency proceedings were numerous or of increasing seriousness; (3) Orozco's performance on probation was unsatisfactory; and (4) Orozco was armed with or used a weapon during the commission of the crime. Here, Orozco argues that his Sixth Amendment rights were violated because he was not provided with a jury trial as to the second and third factors above.

In response, the People urge us to follow *People v. Flowers* (2022) 81 Cal.App.5th 680, review granted October 12, 2022, S276237. There, the court summarily concluded that prior performance on probation and prior prison terms were properly established by certified records and thus appropriately considered by the trial court under section 1170, subdivision (b)(3). (*Flowers*, at p. 685.)

Orozco, in turn, argues that *Flowers* is not instructive. To this end, he points out that in *Flowers*, unlike here, the defendant was sentenced before Senate Bill 567 was effective. Moreover, Orozco emphasizes that the defendant in *Flowers* did not claim his right to a jury was violated. We also note that at least one other court questioned the *Flowers* court's analysis. (See *People v. Falcon* (2023) 92 Cal.App.5th 911, 953–954, review granted Sept. 13, 2023, S281242.)

However, we need not resolve this dispute. Because, even if we assume that the trial court erred in making factual findings regarding whether Orozco's prior convictions and sustained petitions in juvenile delinquency proceedings were numerous or of increasing seriousness as well as whether Orozco's performance on probation or parole was unsatisfactory, we would find such errors harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

27

Here, we are fortunate to have a detailed record concerning Orozco's sentencing. It is clear the trial court was diligently trying to sentence Orozco under the recent changes in the sentencing process per Senate Bill 567 and Assembly Bill 124. Counsel engaged in vigorous argument regarding the various aggravating and mitigating factors. And Orozco's counsel zealously advocated on behalf of Orozco, clearly and emphatically arguing his position and making a thorough record. To this end, we note that, in response to defense counsel's compelling arguments, the trial court explicitly indicated, "The only aggravating factor that this Court is using is the record of the prior conviction, as well as the personal use of a deadly weapon." Again, after further objections by defense counsel, the trial court explained "that the aggravating factors of the prior conviction is in itself sufficient to justify the upper term in this case."

Thus, based on the trial court's own words, we are confident that even if the court had not improperly considered two of the aggravating factors, it would have selected the upper term sentence for Orozco based on one or two of the aggravating factors that were properly before it. The trial court could consider Orozco's prior convictions based on a certified record of conviction without submitting the prior convictions to a jury. (§ 1170, subd. (b)(3).) Here, Orozco does not challenge the court's determination that Orozco suffered prior convictions. Further, it is undisputed that the jury found true that Orozco personally used a deadly weapon.[12] (See rule 4.421(a)(2).) As

---

[12] Below, defense counsel acknowledged that the jury found Orozco had personally used a deadly weapon, but argued Orozco was still entitled to have a jury determine whether the use of the knife was an aggravating factor. Orozco abandoned this argument on appeal by not addressing it in his opening brief. (See *Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 ["[A]n appellant's failure to discuss an issue in its opening brief forfeits the issue on appeal"].)

such, on the record before us, we determine any error in the trial court's consideration of certain aggravating factors that should have been proven to the jury is harmless beyond a reasonable doubt.

Next, Orozco contends the trial court abused its discretion "by rejecting the theory that the rather extreme childhood abuse and neglect Mr. Orozco suffered could have contributed to an overreaction when either attacked or provoked by his roommate and girlfriend's brother." However, this argument overlooks the fact that the court allowed defense counsel to comprehensively argue about mitigating factors, including Orozco's childhood abuse and trauma. Moreover, the court explicitly set out how it contemplated that evidence:

> "I did consider Mr. Orozco's childhood trauma. I did get reports from CWS [Child Welfare Services] regarding the abuse that he did suffer when he was, I believe he was eight years old, and there was significant trauma that he did experience based on the violence in his home, and that's evidence. He was eight years old at the time. The State did get involved.

> "The time of this crime, he was I believe 26 years old at the time of this incident. And so the concern is whether there was some contributing factor in the commission of this crime to his childhood trauma.

> "At the time of this incident when he was 26 he was living in a committed relationship, he had a full-time job. And what I'm not sure of is if there was anything about this incident that triggered his childhood trauma. Because I didn't see the connection between this incident, other than the fact that he did suffer childhood trauma as a child.

> "I wasn't sure in terms of what the direct connection was between this crime and what triggered – what about his childhood trauma triggered this incident.

"But even if this Court did find that the contributing factor of his childhood trauma, there was a contributing factor in the commission of this crime, I do find that it's contrary to the interests of justice to impose the low term, because the aggravating factors, the sheer violence of this incident outweigh the mitigating factor of the childhood trauma.

"So on both of those prongs that it's not clear whether it was a contributing factor in the commission of the crime and that it is contrary to the interest of justice to impose a low term.

"As to whether this is a midterm or aggravated upper term, as this Court indicated this was a crime of great violence and those aggravating factors that this court outlined does outweigh the mitigating factors."

After defense counsel objected to the court's consideration of "any aggravating factor . . . outside of [Orozco's] prior record" to deviate from the middle term, the court explained that it was balancing the mitigating factors against the aggravating factors of Orozco's prior convictions and juvenile adjudications as well as the personal use of a deadly weapon as found true by the jury.

The court then allowed defense counsel to further argue about the impact of the mitigating factors before the court reiterated that the mitigating factors did not outweigh the aggravating factors.

On this record, it is clear the court allowed defense counsel the opportunity to present mitigation evidence, including under Assembly Bill 124, and sufficiently considered that evidence. The court, nonetheless, disagreed with defense counsel and concluded that the mitigation factors did not warrant a low term. Furthermore, the court weighed those mitigation factors against the two aggravating factors properly before it and determined that the upper term was appropriate. On appeal, Orozco essentially asks us to reweigh the mitigation factors. That is not our role under the abuse of

30

discretion standard.  Accordingly, we conclude that the trial court did not abuse its discretion in sentencing Orozco.  The court did not exercise its discretion in an arbitrary or capricious manner, and the sentence was consistent with the letter and spirit of the law.  (See *Sandoval*, *supra*, 41 Cal.4th at p. 847.)

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:


CASTILLO, J.


RUBIN, J.